**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** §<br>§<br>§ | |
| **Plaintiff**, § | |
| **v.** § | **Case No.: 3:25-cv-1716** |
| **KEITH A. ROSENBAUM, WILLIAM A. JUSTICE,**<br>**RANDELL R. TORNO, and BRIAN D. SHIBLEY** §<br>§ | |
| **Defendants**, § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission", "SEC", or "Plaintiff") files this Complaint against Defendants Keith A. Rosenbaum ("Rosenbaum"), William A. Justice ("Justice"), Randell R. Torno ("Torno"), and Brian D. Shibley ("Shibley") (collectively, "Defendants"), and alleges as follows:

### I.
### SUMMARY

1.      From approximately August 2017 through September 2022, Defendants participated in a fraud scheme led by non-party Philip Verges ("Verges") to artificially inflate stock prices and trading volume in penny-stock companies so that other scheme participants could sell their shares valued at more than $112 million at the time they were issued. Without the Defendants' participation, the Verges-led investment scheme could not have succeeded.

2.      First, Justice, Shibley, and Torno (collectively, the "CEOs") served respectively as the chief executive officers for three of the penny-stock issuers: (1) Alternet Systems, Inc., f/k/a SchoolWeb Systems, Inc., f/k/a North Pacific Capital Corp. ("Alternet"); (2) Puration, Inc.,

f/k/a Southwest Resources, Inc., f/k/a Southwest Hydrocarbons, Inc., f/k/a Apollo Drilling, Inc., f/k/a Siam Imports, Inc. ("Puration"); and (3) Vaycaychella, Inc., f/k/a World Series of Golf, Inc., f/k/a World Series of GolfD [*sic*], Inc., f/k/a World Series of Golf, Inc., f/k/a Innovative Consumer Products, Inc. ("Vaycaychella") (collectively, the "Issuers").  However, the CEOs essentially functioned as Verges' employees, not executives, as Verges controlled these companies and directed the CEOs' actions.  At Verges's direction, the CEOs all signed, or allowed their signatures to appear on, the Issuers' respective disclosure statements published to a website maintained by OTC Markets Group, Inc. ("OTC Markets")—a platform for trading penny stocks without using a mainstream exchange—that they reasonably should have known (a) contained materially false and misleading information regarding who prepared the penny-stock issuers' financial statements, and (b) concealed Verges's control of the Issuers.  At Verges' direction, the CEOs also signed documents that facilitated share issuances to Verges's nominees without exercising reasonable care in inquiring whether the issuances were appropriate and/or accurate.  Shibley and Torno further facilitated Verges's scheme by executing promissory notes with Verges's companies SMEA2Z, LLC ("SMEA2Z") and 143 Partners, LLC ("143 Partners") for amounts that they knew, or reasonably should have known, that their respective companies could not pay based on the companies' financial conditions at the time the promissory notes were executed.  As a result of the CEOs' actions, Verges's nominees received more than 4.89 billion shares of stock that were discounted between approximately 77-94% of the prevailing market prices.

3.      Second, Rosenbaum facilitated the Verges fraud by authoring numerous attorney opinion letters pursuant to Rule 144 of the Securities Act of 1933 ("Securities Act") for Verges's nominees, including non-party Blue Citi, LLC ("Blue Citi").  Rosenbaum authored 17 such

opinion letters after being suspended from practicing law in 2019 by the State Bar of California (the "California Bar"). Rosenbaum was subsequently disbarred in 2020 and authored at least 73 more opinion letters for Verges' nominees following his disbarment. These 90 opinion letters were issued to various transfer agents and facilitated the issuance or transfer of billions of discounted, unrestricted shares to Verges's nominees.

4.    By committing the acts alleged in this Complaint, Defendants directly or indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices, and/or courses of business that violate the antifraud provisions of the federal securities laws; specifically, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2), (3)]. In addition, Rosenbaum's actions further violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

5.    In the interest of protecting the public from any further fraudulent activity and harm, the Commission brings this action against Defendants seeking, as prayed below: (a) permanent injunctive relief; (b) disgorgement of ill-gotten gains; (c) prejudgment interest on those ill-gotten gains; (d) civil penalties; and (e) all other equitable and ancillary relief to which the Court determines that the Commission is entitled.

## II.
## JURISDICTION AND VENUE

6.    This case involves the offer, purchase, and sale of stock, which is a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c]. During the relevant period, all of the Issuers' stock qualified as "penny stocks" because they were equity securities with a price of less than five dollars per share that did not meet any of the exceptions from the definition of a "penny stock," as defined by Section

3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder.  The Commission brings this action

under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange

Act [15 U.S.C. § 78u(d)], seeking to permanently restrain and enjoin the Defendants from

engaging in the acts and practices alleged herein.

7.     The Court has jurisdiction over this action under Sections 20(d) and 22(a) of the

Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  Defendants, directly and indirectly,

made use of the mails or of the means and instrumentalities of interstate commerce in connection

with the acts, omissions, transactions, practices, and/or courses of business described in this

complaint.

8.     Venue is proper because the Dallas Division of the Northern District of Texas is

where Shibley and Torno reside and where a substantial part of the acts, omissions, transactions,

practices, and/or courses of business giving rise to the claims occurred.

9.     Defendants engaged in the acts, omissions, transactions, practices, and/or courses

of business described in this Complaint in connection with the offer, purchase, and/or sale of

securities.

### III.
### DEFENDANTS AND RELATED PERSONS

**A.    Defendants**

10.    Justice, age 80, resides in McKinney, Texas and is a retired schoolteacher.  Justice

served as CEO of Vaycaychella Inc. (ticker: VAYK) from at least January 2020 to May 2024.

Prior to Justice's involvement with Vaycaychella, he had never been employed by a publicly

traded company.

11.    Shibley, age 67, resides in Dallas, Texas.  Shibley has a Bachelor of Arts degree

from the University of Western Ontario and has a background in real estate development. Shibley has been the CEO of Puration, Inc. (ticker: PURA) since 2012. Prior to Shibley's involvement with Puration, he had never been employed by a publicly traded company.

12. Torno, age 62, resides in Richardson, Texas. Torno has a degree in Mass Communications from the University of South Dakota and served in the Army until he retired in 2011. Torno also spent 20 years in film production, producing training and documentary films. Torno has been the CEO of Alternet Systems, Inc (ticker: ALYI) since July 2017 and was the CEO of another publicly traded microcap company from approximately 2016 to 2018.

13. Rosenbaum, age 66, resides in Dove Canyon, California and was formerly a California-licensed attorney. On August 19, 2019, the California Bar suspended Rosenbaum from practicing law due to his conviction on 11 felony counts under the California Revenue and Taxation Code. The California Bar subsequently disbarred Rosenbaum on October 16, 2020.

**B.    Related Individuals and Entities**

14. Verges, a/k/a Tom Faye, a/k/a Mike Murphy, age 60, resides in Dallas, Texas. Verges maintained undisclosed control over the Issuers and other penny stock companies (collectively, "PSCs"). Verges is also the owner and control person of SMEA2Z and 143 Partners. The Commission sued Verges in a pending civil action for violations of the federal securities laws. *See SEC v. Philip Verges, et al.*, No. 3:23-cv-2146-D (N.D. Tex. filed Sept. 26, 2023) (the "Verges Civil Action"). On December 10, 2024, the Department of Justice (Fraud Section) indicted Verges in connection with the same scheme that formed the basis of the Verges Civil Action. *United States v. Phillip Verges,* No. 3:24-CR-551-E (N.D. Tex. filed Dec. 10, 2024) (the "Verges Criminal Action"). The Verges Civil Action is currently stayed pending the resolution of the Verges Criminal Action. *See* Verges Civil Action at Dkt. No. 56

15. Blue Citi is a New York LLC founded in 2013 with its principal place of business

in New York, New York. Blue Citi is primarily in the business of buying and selling convertible promissory notes of penny stock companies. Blue Citi, along with its managing members and control persons, are named defendants in the Verges Civil Action.

16.     SMEA2Z is a Wyoming LLC formed in 2018 with its principal place of business in Dallas, Texas. SMEA2Z purportedly provides consulting services to microcap issuers, including the Issuers. Verges is the sole member, owner, and control person of SMEA2Z and is an authorized signer on all of SMEA2Z's known bank accounts. SMEA2Z is a named relief defendant in the Verges Civil Action.

17.     143 Partners is a Wyoming LLC formed in 2016 with its principal place of business in Dallas, Texas. 143 Partners purportedly provides consulting services regarding sales, marketing, merger and acquisition fundraising, among other services, to microcap issuers, including Puration. Verges is the sole member, owner, and control person of 143 Partners and an authorized signer on its one known bank account. 143 Partners is a named relief defendant in the Verges Civil Action.

18.     Alternet is a non-SEC-reporting microcap company that was based in Addison, Texas and incorporated in Wyoming. On March 31, 2017, Alternet filed a Form 15 terminating its registration with the Commission. Alternet's common stock is quoted and traded under the symbol "ALYI" on OTC Link, whose parent company is OTC Markets ("OTC Link").

19.     Puration is a non-SEC-reporting microcap company that was based in Farmersville, Texas and incorporated in Wyoming. On March 27, 2009, Puration filed a Form 15 terminating its registration with the Commission. Puration's common stock is quoted and traded under the symbol "PURA" on OTC Link.

20.     Vaycaychella is a non-SEC-reporting microcap company that was based in Las

Vegas, Nevada and incorporated in Wyoming.  On February 23, 2012, Vaycaychella filed a

Form 15 terminating its registration with the Commission.  Vaycaychella's common stock is

quoted and traded under the symbol "VAYK" on OTC Link.

## IV.
## STATEMENT OF FACTS

**A.    Overview of the Verges Scheme.**

21.    Verges controlled several PSCs, who by and large had no actual or substantial

business operations, no employees, and little or no revenue.  He concealed his control of the

PSCs by installing Justice, Shibley, Torno, and others as figurehead CEOs and by purportedly

providing "consulting services" to Alternet, Puration and other PSCs through the companies he

owned and controlled, including SMEA2Z and 143 Partners (collectively, the "Verges

Companies").  These figurehead CEOs were mostly Verges's trusted friends—most of whom

had no experience managing or running a publicly traded company.  From at least January 2017

through June 2022, Verges orchestrated a multi-faceted scheme to enrich himself by fraudulently

directing the PSCs to issue free-trading shares of stock in the PSCs to nominees, such as Blue

Citi.  At Verges's direction, the nominees subsequently sold the shares into the market or to other

purchasers and then kicked back a portion of the trading proceeds to Verges.

22.    As part of the scheme, the Verges Companies obtained debt instruments issued by

the PSCs as: (a) purported compensation on sham consulting agreements between certain PSCs

and the Verges Companies; and/or (b) reimbursements to the Verges Companies for purportedly

fronting some of the PSCs' expenses.  Verges then had his nominees—particularly Blue Citi—

purchase interests in these debt instruments.  The nominees also obtained these convertible debt

instruments by purchasing them from third parties, exchanging them for consulting work, and

exchanging them for purported investments in the PSCs.  Verges then allowed the nominees to

convert their interests in the convertible debt instruments to stock in the PSCs at prices far below market value.

23.     From at least June 2017 to June 2022, Verges directed the issuance of approximately 5.2 billion shares of stock in the PSCs to the nominees at an aggregate conversion price of approximately $15 million.  These shares had an aggregate market value of over $112 million at the time of issuance.  Once the Nominees obtained stock in the PSCs, Verges facilitated transactions for the nominees to transfer their shares to third parties for sale into the market.  Those open-market sales occurred at prices substantially higher than their acquisition costs, in part, because of the conversion discounts that Verges provided.  Blue Citi and other nominees received more than $52 million in trading proceeds from their sales of stock in the PSCs beginning in at least December 2017.  Verges also ensured that the nominees could dump their shares into the market, and sustained market interest and trading volume in PSCs' stocks, by posting more than 1,400 press releases that he drafted, including some that were false and misleading.  In return for his efforts, the nominees paid Verges, through the Verges Companies, more than $19 million, which included payments for the initial debt instruments and kickbacks from the trading proceeds.

24.     In addition, Verges surreptitiously executed the aforementioned debt instruments. Verges hid his control of the PSCs and his involvement in the promissory note conversions while simultaneously manipulating the market to increase the trading volume of the PSCs' stocks. Persons under Verges's direction and with his approval drafted and published OTC Disclosure Statements that concealed: (1) Verges's control of the Issuers; (2) Verges's role in preparing portions of the PSCs' OTC Financial Reports; and (3) the accurate number of outstanding PSC convertible promissory notes.  Verges also concealed his control of the PSCs by using the aliases

"Mike Murphy" and "Tim Faye" in communications with transfer agents to facilitate the transfer of PSC stock to the nominees

**B.    The Issuers' CEOs Were Negligent in Their Roles.**

25.    To effectuate his scheme, Verges formed and leveraged relationships with the Issuers' executives to convince them to turn over control of the Issuers to him so he could install new CEOs.  Verges subsequently installed the Issuers' respective CEOs, which were his associates and a prior Army friend, because he knew he could direct and control them due to their lack of experience as executives of publicly traded companies.  Ultimately, Verges used his control over these companies to direct the CEOs to execute public disclosure statements and documents that facilitated stock issuances to his nominees.  The Issuers did not pay the CEOs a salary because they lacked sufficient revenue to compensate them.  Bank records indicate that Verges and his companies primarily paid the CEOs from the kickbacks that Verges received from his nominees.

### 1.    *Justice and Vaycaychella*

26.    Verges maintained undisclosed control of Vaycaychella and installed Justice as Vaycaychella's CEO in or around January 2020.  Justice served in this role through May 2024 and was Vaycaychella's only employee.  Justice had no experience working at a publicly traded company prior to his time at Vaycaychella and did not understand the role, responsibilities, and expectations of a CEO of a publicly traded company.  Even though Justice had the CEO title, he was essentially Verges' employee as Verges controlled and directed Justice's actions with respect to Vaycaychella's operations.

27.    During Justice's tenure as CEO, Vaycaychella published 11 disclosure statements to OTC Markets.  These disclosure statements were prepared by others under the direction of Verges.  Each disclosure statement, however, falsely represented that Justice had prepared

Vaycaychella's financial statements for the reporting period. Also during Justice's tenure, Vaycaychella published six disclosure statements that included the false representation that Justice prepared Vaycaychella's financials and failed to disclose Verges as a Vaycaychella control person as required by the disclosure statements' guidelines. Specifically, OTC Markets' "Disclosure Statement Pursuant to the Pink Basic Disclosure Guidelines" include a section with instructions that direct companies to provide information about officers and directors of the company as well as "*any person that performs a similar function*, regardless of the number of shares they own." (emphasis added). According to the guidelines, this section is intended to provide investors with a clear understanding of the identity of all persons or entities involved in managing, controlling, or advising the operations, business development, and disclosure of the filing company. These six disclosure statements identified individuals and entities as Vaycaychella control persons, but failed to disclose Verges.

28.    The aforementioned Vaycaychella disclosure statements all contained certifications in substantially the same form, with Justice certifying that: (1) he had reviewed Vaycaychella's disclosure statement; (2) the disclosure statement did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and (3) the financial statements and other financial information fairly presented in all material respects the financial condition, results of operations, and cash flows of the issuer. Justice's electronic signature as Vaycaychella's CEO appeared after each of these certifications. However, Justice did not always review Vaycaychella's disclosures prior to them being published, and he did not sign off on all disclosures that bear his signature. While Justice reviewed some of Vaycaychella's disclosures,

he never took steps to correct false or misleading statements regarding the preparation of Vaycaychella's financials or disclose Verges as Vaycaychella's control person.

29.     As CEO, Justice also executed documents on behalf of Vaycaychella that helped Verges carry out his scheme. As one example, on May 5, 2021, Justice signed an Issuance Resolution that facilitated the issuance of 25 million Vaycaychella shares to Verges nominee Blue Citi. Similarly, on March 8, 2021, Justice executed, and provided to Vaycaychella's transfer agent, a Shareholder Signature Indemnity attesting to the authenticity of Blue Citi's signature in lieu of a separate signature guarantee. This indemnity facilitated Blue Citi's transfer of 15 million Vaycaychella shares to a third party for sale into the market. Justice signed these documents at Verges's direction without inquiring into the appropriateness of the issuances and transfers. With respect to stock issuances, Justice reviewed documents, but he never made any changes to the documents. Justice never inquired into, or took any other steps to understand, why he was signing these documents, the appropriateness of Vaycaychella's share issuances, or who Vaycaychella was issuing stock to and why.

30.     Justice also was aware that Verges concealed his identity from Vaycaychella's transfer agent. Verges repeatedly emailed Vaycaychella's transfer agent using the alias "Tom Faye" to conceal his identity. For example, in December 2020, Justice was included on an email where Verges emailed the transfer agent using his "Faye" alias to facilitate the issuance of nine million Vaycaychella shares to Blue Citi. Justice knew "Tom Faye" was an alias Verges used.

31.     Justice received at least $170,300 in CEO compensation while Verges' scheme was ongoing. SMEA2Z paid Justice's compensation—as opposed to Vaycaychella—because Vaycaychella could not afford to pay. SMEA2Z used money Verges received from his nominees' kickbacks to pay Justice. During Justice's tenure as CEO, Vaycaychella issued more

than 774 million shares to Verges's nominees at an aggregate conversion price of approximately $1.2 million. At the times of issuance, these shares had a market value of approximately $18.2 million, resulting in Verges's nominees receiving a discount of almost 94% off the shares' market value.

### 2.    *Shibley and Puration*

32.    Shibley agreed to become Puration's CEO as part of the settlement of a dispute between two of Puration's prior executives. Shibley has served as Puration's CEO since at least September 2012, is Puration's sole employee, and is identified as Puration's CEO on OTC Markets. Verges served as a consultant for Puration starting as early as 2012, gained control of Puration at that time, and maintained undisclosed control of Puration throughout his scheme. As with Justice and Vaycaychella, Verges directed Shibley's actions with respect to Puration's operations.

33.    During Shibley's tenure as CEO, Puration published 14 disclosure statements to OTC Markets that falsely stated that Shibley prepared Puration's financial statements for the applicable period. Shibley knew or reasonably should have known that Puration's financials were prepared by other persons under the direction of Verges. Puration also published six disclosure statements that included the false representation about Shibley preparing Puration's financial statements and, pursuant to OTC Markets' disclosure guidelines, should have disclosed information about Puration's officers and directors, as well as any person that performed a similar function. These disclosure statements identified certain individuals and entities as Puration control persons, but they failed to disclose Verges. Each of the aforementioned Puration disclosure statements also contained certifications in substantially the same form as the certifications that Justice signed (discussed above in Section IV(B)(1)), and Shibley's electronic signature as Puration's CEO appeared after each certification. As CEO, Shibley reviewed some

of Puration's OTC Disclosures, sometimes after they were posted to OTC Markets, but he took no action to correct the disclosures or identify Verges as Puration's control person in the disclosures.

34.     Further, Shibley executed consulting agreements on behalf of Puration that enabled the Verges Companies to obtain discounted convertible debt in Puration that Verges sold to his nominees.  As an example, in April 2018, Shibley executed a consulting agreement on behalf of Puration, agreeing to pay SMEA2Z $350,000 annually.  Puration could not afford to pay SME2Z's consulting fee, as it reported a net loss of over $40,000 in 2017 and a net profit of only $80,000 for the first quarter of 2018.  The same day that it executed the consulting agreement with SMEA2Z, Puration issued SMEA2Z a $350,000 convertible promissory note.  On June 21, 2018, SMEA2Z assigned the entire note to one of Verges's nominees for purported consideration of $350,000.  Bank records reveal that the nominee paid SMEA2Z at least $500,000, some of which may have included payment for the assignment and the balance was a kickback from sales of the stock.  The nominee executed notices of conversion on July 15, 2020, and October 12, 2020, and Puration's transfer agent issued 104 million discounted Puration shares to the nominee.  Further, Shibley reviewed Puration's financials *after* they were posted on OTC Markets.  Despite having knowledge of Puration's actual financial condition, Shibley never questioned why Puration was entering into these consulting agreements with the Verges Companies for amounts that Puration could not afford to pay, whether Puration needed SMEA2Z's purported services, and whether Puration was receiving adequate value for SMEA2Z's consulting fee.

35.     Shibley also executed documents on behalf of Puration that facilitated issuances of shares to Verges's nominees.  As an example, on November 3, 2020, Shibley signed an

Issuance Resolution that authorized the issuance of 32.4 million Puration shares to Blue Citi. The following day, Shibley signed a letter addressed to Puration's transfer agent, waiving the requirement for a signature medallion guarantee and facilitating the issuance of 32.4 million Puration shares to Blue Citi. Shibley never inquired as to why he was signing the documents or whether the share issuances were appropriate. In fact, Shibley paid little attention to Puration's stock issuances because Verges handled them.

36.     Shibley received at least $165,000 in CEO compensation while Verges' scheme was ongoing, all paid by Verges or one his companies from kickbacks Verges received from his nominees, or other transactions Verges controlled and directed, because Puration could not afford to pay. During Shibley's time as CEO, Puration issued more than 1.2 billion shares to Verges's nominees at an aggregate conversion price of approximately $7.2 million. At the times of issuance, these shares had a market value of approximately $31.8 million, resulting in Verges's nominees collectively receiving a discount of almost 77% off the shares' market value.

### 3.    Torno and Alternet

37.     Verges also maintained undisclosed control over Alternet, and installed Torno as CEO in or around July 2017. Torno was Alternet's sole employee when Verges was carrying out his scheme and continues to serve as Alternet's CEO. As with Justice and Shibley, Verges directed Torno's actions with respect to Alternet.

38.     During Torno's tenure as CEO, Alternet has published 14 disclosure statements to OTC Markets that were prepared by others under the direction of Verges. Each disclosure statement, however, falsely stated that Torno prepared the financial statements for the applicable period. Alternet also published six disclosure statements that included the representation about Torno preparing Alternet's financial statements and, pursuant to OTC Markets' disclosure guidelines, should have disclosed information about Alternet's officers and directors, as well as

any person that performed a similar function.  These disclosure statements identified certain

individuals and entities as Alternet control persons, but they also failed to disclose Verges as an

Alternet control person.  The aforementioned disclosure statements contained certifications in

substantially the same form as the certifications that Justice and Shibley signed.  Torno's

electronic signature as CEO appears after each certification.  Torno received notifications when

Alternet's disclosures were published on OTC Markets but never took any steps to verify

whether the information in Alternet's disclosures was accurate.

39.     As Alternet's CEO, Torno executed consulting agreements with Verges's

companies that enabled Verges to obtain discounted convertible debt in Alternet that Verges then

sold to his nominees.  As an example, in January 2019, Torno executed a consulting agreement

whereby Alternet agreed to pay $400,000 annually to SMEA2Z.  However, Alternet could not

afford to pay SMEA2Z's consulting fee, as it reported a net loss of over $600,000 in 2018.  On

February 25, 2021, Alternet and SMEA2Z executed a Debt Settlement Agreement, whereby they

agreed that Alternet would settle its outstanding debt to SMEA2Z by issuing to SMEA2Z

common shares of Alternet stock at a deemed price of $0.0001 per share.  Torno signed the Debt

Settlement Agreement on behalf of Alternet.  SMEA2Z sold $200,000 of the debt to one of

Verges's nominees on March 1, 2021, and the nominee subsequently converted the debt into

millions of Alternet shares.

40.     Torno also executed documents on behalf of Alternet that helped Verges facilitate

his scheme.  For example, in connection with the February 25, 2021, Debt Settlement Agreement

discussed above, Torno not only executed the Debt Settlement Agreement, but he also signed a

letter addressed "To Whom It May Concern" confirming that SMEA2Z earned the $400,000

consulting fee from Alternet.  Torno never analyzed whether terms of the Debt Settlement

Agreement were equitable for Alternet or whether SMEA2Z actually performed services entitling it to the consulting fee. Torno never questioned the appropriateness or prudence of any of these transactions, which helped facilitate the issuance of 10 million Alternet shares to one of Verges's nominees.

41.     Torno also was aware that Verges used an alias to conceal his identity from Alternet's transfer agent. To facilitate share issuances to his nominees, Verges repeatedly emailed the transfer agent using the alias "Mike Murphy" to conceal his identity. As an example, in January 2021, Torno was included on an email where "Mike Murphy" emailed a Treasury Order for the issuance of 46,338,000 shares to Verges's nominee, Blue Citi. Torno knew "Mike Murphy" was an alias Verges used.

42.     Torno received at least $125,000 in CEO compensation while Verges' scheme was ongoing, all paid by SMEA2Z from kickbacks Verges received from his nominees, because Alternet could not afford to pay. Alternet issued more than 2.9 billion shares to Verges's nominees during Torno's tenure as CEO at an aggregate conversion price of approximately $5.9 million. At the times of issuance, these shares had a market value of approximately $60.5 million. As a result, Verges's nominees collectively received a discount of approximately 90% off the market value of the Alternet shares.

**C.    Rosenbaum Issued Opinion Letters to the Issuers' Transfer Agents After He was Suspended  and Ultimately Barred From Practicing Law**

43.     Rosenbaum formed Spectrum Law Group APC ("Spectrum APC") in 2017. Spectrum APC represented Blue Citi and other Verges nominees in connection with the share issuances of the Issuers and other Verges-controlled PSCs by authoring and issuing Rule 144 opinion letters. These Rule 144 opinion letters were necessary in order to apply an exemption that permitted the public resale of restricted or control securities if a number of conditions are

met, including how long the securities are held, the way in which they are sold, and the amount that can be sold at any one time. Without such Rule 144 opinion letters, Blue Citi would not have been able to sell the Issuers' stock into the public markets in furtherance of Verges's scheme. Rosenbaum signed these letters as "Keith A. Rosenbaum."

44.     On August 19, 2019, the California Bar suspended Rosenbaum from practicing law due to 11 felony convictions under the California Taxation and Revenue Code for failing to file his tax returns. While he was suspended, Rosenbaum drafted at least 17 opinion letters for Blue Citi and issued those letters to Alternet's and Vaycaychella's transfer agents to facilitate share issuances to Blue Citi. However, instead of signing his name to these letters, Rosenbaum affixed an electronic "Spectrum Law Group" signature, which acted to conceal his name from the letters to hide the fact that he drafted them while his bar license was suspended.

45.     On October 16, 2020, the California Bar disbarred Rosenbaum, but Rosenbaum nonetheless continued to prepare Rule 144 opinion letters to facilitate the issuance of stock to Verges's nominees, such as Blue Citi. Following his disbarment, Rosenbaum drafted at least another 33 opinion letters for Blue Citi with the "Spectrum Law Group" signature and issued those letters to Alternet's and Vaycaychella's transfer agents. Rosenbaum was the only attorney at Spectrum APC who drafted Rule 144 opinion letters. These 50 opinion letters (the "Spectrum APC Letters") facilitated the issuance to Blue Citi of more than 1.2 billion unrestricted shares of stock.

46.     In 2021, Rosenbaum's friend, who was a licensed attorney (the "Attorney"), heard about Rosenbaum's criminal issues and reached out to him. Rosenbaum offered the Attorney the opportunity to work with some of Rosenbaum's clients by drafting Rule 144 opinion letters on their behalf. The Attorney accepted the offer and, in September 2021, he and Rosenbaum

17

formed Spectrum Law Group, LLC ("Spectrum LLC") for this business endeavor. The Attorney drafted and issued approximately seven opinion letters for Rosenbaum's clients. However, Rosenbaum drafted an additional 40 opinion letters for Verges's nominees on Spectrum LLC's letterhead without the Attorney's knowledge. Rosenbaum forged the Attorney's signature on these letters without the Attorney's permission, which acted to conceal Rosenbaum's name from the letters to hide the fact that he drafted them while he was barred from the practice of law.

47.    These Rule 144 opinion letters from Spectrum LLC were issued to the Issuers' transfer agents and facilitated the issuance of more than 1.8 billion unrestricted shares to Verges's nominees. These 40 Rule 144 opinion letters from Spectrum LLC were in addition to the letters that Rosenbaum drafted for Blue Citi while at Spectrum APC.

48.    Rosenbaum authored and issued at least 90 opinion letters after his 2019 suspension and helped facilitate the issuance of more than 3 billion shares of the Issuers' stocks to Verges's nominees. These shares were ultimately sold into the public market. Bank records show that between December 2019 and the present, Verges's nominees paid fees for Rosenbaum's preparation of Rule 144 opinion letters. Rosenbaum received at least $555,762 from the nominees to bank accounts he controlled.

## V.
## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Exchange Act
Section 10(b) and Rule 10b-5**

***Against Rosenbaum***

49.    Plaintiff re-alleges and incorporates paragraphs 1 through 48 of this Complaint by reference as if set forth verbatim in this Claim.

50.    Rosenbaum facilitated the Verges fraud by authoring numerous Rule 144 opinion letters for Verges's nominees when he was not permitted to provide such legal services, because he was suspended, and later disbarred, from the practice of law.  Among other things, Rosenbaum authored 17 such opinion letters after being suspended from practicing law in 2019 by the California Bar.  Rosenbaum was subsequently disbarred in 2020 and authored at least 73 more opinion letters for Verges's nominees following his disbarment.  These opinion letters were issued to various transfer agents and facilitated the issuance of more than 3 billion discounted, unrestricted shares to Verges's nominees.  Instead of signing his name to these letters, Rosenbaum either affixed an electronic "Spectrum Law Group" signature or forged the Attorney's signature to intentionally hide the fact that he drafted them while he was suspended or barred from the practice of law.

51.    By engaging in the acts and conduct alleged herein, Rosenbaum, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

    a.    employed a device, scheme, or artifice to defraud; and/or

    b.    made an untrue statement of material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.    engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

52.    By reason of the foregoing, Rosenbaum violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Securities Act
### Securities Act Section 17(a)

*Sections 17(a)(2) and (3) Against All Defendants and Section 17(a)(1) Against Rosenbaum*

53.     Plaintiff re-alleges and incorporates paragraphs 1 through 48 of this Complaint by reference as if set forth verbatim in this Claim.

54.     Justice, Shibley, and Torno (as defined above, the "CEOs") served as the Chief Executive Officers for the Issuers.  However, the CEOs essentially functioned as Verges' employees, because Verges controlled these companies and directed the CEOs' actions.  At Verges's direction, the CEOs all signed, or allowed their signatures to appear on, disclosure statements published to a website maintained by OTC Markets that they reasonably should have known (a) contained materially false and misleading information regarding who prepared the statements, and (b) concealed Verges's control of the Issuers.  At Verges' direction, they also signed documents that facilitated share issuances to Verges's nominees without exercising reasonable care in inquiring whether the issuances were appropriate and/or accurate.  Shibley and Torno further facilitated Verges's scheme by executing promissory notes with Verges's companies for amounts that they knew, or reasonably should have known, that their respective companies could not pay based on the companies' financial conditions.  As a result of the CEOs' actions, Verges's nominees received more than 4.89 billion shares of stock that was discounted between approximately 77-94% of the prevailing market price.

55.     In addition, Rosenbaum facilitated the Verges fraud by authoring numerous attorney opinion letters for one of Verges's nominees.  Among other things, Rosenbaum authored 17 such opinion letters after being suspended from practicing law in 2019 by the

California Bar.  Rosenbaum was subsequently disbarred in 2020 and authored at least 73 more opinion letters for Verges's nominees following his disbarment.  These opinion letters were issued to various transfer agents and facilitated the issuance of more than 3 billion discounted, unrestricted shares to Verges's nominees.  Instead of signing his name to these letters, Rosenbaum either affixed an electronic "Spectrum Law Group" signature or forged the Attorney's signature to intentionally hide the fact that he drafted them while he was suspended or barred from the practice of law.

56.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

      a.    knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      b.    knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

57.    In addition, by engaging in the acts and conduct alleged herein, Rosenbaum, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, has knowingly or with severe recklessness employed a device, scheme, or artifice to defraud.

58.    By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2), (3)].

59.     In addition, Rosenbaum also violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter judgments:

1.     Permanently enjoining Rosenbaum from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

2.     Permanently enjoining Justice, Shibley, and Torno from violating, directly or indirectly, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(2), (3)];

3.     Permanently enjoining Rosenbaum, Justice, Shibley, and Torno, pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] (and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] as to Rosenbaum only), from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1];

4.     Permanently enjoining Justice, Shibley, and Torno, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

5.     Ordering Rosenbaum and Torno to disgorge all ill-gotten gains they received as a result of the conduct alleged herein, together with pre-judgment interest on those amounts,

pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

6.      Imposing civil penalties against Shibley, Torno, and Rosenbaum pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] (and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] as to Rosenbaum only) for violations of the federal securities laws as alleged herein;

7.      Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

8.      Granting such other and further relief as this Court may determine to be just and necessary.


Dated:  July 1, 2025                    Respectfully submitted,

                                        */s/ Jason P. Reinsch*
                                        Jason P. Reinsch
                                        Texas Bar No. 24040120
                                        United States Securities and Exchange Commission
                                        Fort Worth Regional Office
                                        801 Cherry Street, Suite 1900
                                        Fort Worth, Texas 76102
                                        (817) 900-2601 (phone)
                                        (817) 978-4927 (facsimile)
                                        ReinschJ@SEC.gov

                                        ATTORNEY FOR PLAINTIFF SECURITIES
                                        AND EXCHANGE COMMISSION